[No. C067309. Third Dist. May 31, 2012.]

JUROR NUMBER ONE, Petitioner, v.
THE SUPERIOR COURT OF SACRAMENTO COUNTY, Respondent;
DEMETRIUS ROYSTER et al., Real Parties in Interest.

856

## COUNSEL

The Rosenfeld Law Firm and Kenneth Rosenfeld for Petitioner.

No appearance for Respondent.

John K. Cotter, Michael Wise and Keith J. Staten for Real Parties in Interest.

## OPINION

**HULL, J.**—Following the conviction of real parties in interest for various offenses stemming from an assault, respondent court learned that one of the trial jurors, fictitiously named Juror Number One, had posted one or more items on his Facebook account concerning the trial while it was in progress, in violation of an admonition by the court. The court conducted a hearing at which Juror Number One and several other jurors were examined about this and other claimed instances of misconduct. Following the hearing, the court entered an order requiring Juror Number One to execute a consent form

pursuant to the Stored Communications Act (SCA) (18 U.S.C. § 2701 et seq.) authorizing Facebook to release to the court for in camera review all items he posted during the trial.

Juror Number One filed a petition for writ of prohibition with this court seeking to bar respondent court from enforcing its order. He contends the order violates the SCA, the Fourth and Fifth Amendments to the United States Constitution, and his state and federal privacy rights.

■ We conclude the SCA is not applicable to the order at issue here and Juror Number One has otherwise failed to establish a violation of constitutional or privacy rights. We therefore deny the petition.

FACTS AND PROCEEDINGS

Juror Number One was a juror in the trial of *People v. Christian*, Sacramento County Superior Court case No. 08F09791 (the criminal trial) in which the defendants, real parties in interest in this writ proceeding, were convicted of various offenses stemming from the beating of a young man on Halloween night in 2008.

The criminal trial commenced in April 2010, and the jury reached its verdicts approximately two months later, on June 25. On August 10, 2010, one of the trial jurors (Juror No. 5) submitted a declaration in which she stated, among other things, that, on or about May 18, 2010, Juror Number One had "posted comments about the evidence as it was being presented during the trial on his 'Facebook Wall,' inviting his 'friends' who have access to his 'Facebook' page to respond."

On September 17, 2010, respondent court conducted a hearing on this and other allegations of juror misconduct. Four jurors were examined, including Juror Number One and Juror No. 5. Juror No. 5 testified that she did not learn about the Facebook postings until after the trial. Juror Number One had invited her to be a Facebook "friend" and this gave her access to his postings on Facebook, including those during the trial. This is when she saw the post mentioned in her declaration. According to Juror No. 5, one person had responded to the post that he or she liked what Juror Number One had said.

Juror Number One admitted that he posted items on his Facebook account about the trial while it was in progress. However, he indicated those posts contained nothing about the case or the evidence but were merely indications that he was still on jury duty. Juror Number One acknowledged that on one occasion he posted that the case had been boring that day and he almost fell asleep. According to Juror Number One, this was the day they were going

through phone records and he posted that he was listening to piles and piles of "Metro PCS records." Juror Number One testified that he posted something every other day on his Facebook account and later tried to delete some of his posts. He denied reading any responses he received from his "friends" to these postings.

The other two jurors who were examined by the court had nothing to contribute on this issue.

At the conclusion of the hearing, respondent court indicated there had been clear misconduct by Juror Number One, but the degree of such misconduct was still at issue.

On October 7, 2010, counsel for real party in interest Demetrius Royster issued a subpoena to Facebook to produce "[a]ll postings for [Juror Number One] dated 3/01/2010 to 10/06/2010." Attached was an order from respondent court compelling Facebook to "release any and all information, including postings and comments for Facebook member [Juror Number One]."

Facebook moved to quash the subpoena, asserting disclosure of the requested information would violate the SCA. In its memorandum in support of the motion to quash, Facebook asserted the requested information can be obtained from Juror Number One himself inasmuch as he "owns and has access to his own Facebook account, and can disclose his Facebook postings without limitation."

On January 28, 2011, counsel for real party in interest Royster issued a subpoena to Juror Number One to produce "[a]ny and all documents provided to [him] by Facebook" and "[a]ny and all posts, comments, emails or other electronic communication sent or received via Facebook during the time [he was] a juror in the above-referenced matter."

On February 3, 2011, Juror Number One moved to quash the subpoena.

The following day, respondent court granted Juror Number One's motion to quash the subpoena based on overbreadth. However, the court also issued an order requiring Juror Number One to turn over to the court for in camera review all of his Facebook postings made during trial.

Juror Number One filed a petition with this court seeking to bar respondent court from enforcing its February 4, 2011, order. We summarily denied the petition. However, on March 30, 2011, the California Supreme Court granted review and transferred the matter back to us for further consideration. The high court also issued a temporary stay of respondent court's order.

On April 5, 2011, we vacated our prior order denying the petition, issued an order to show cause to respondent court and ordered that the temporary stay remain in effect.

## Discussion

■ Congress passed the SCA as part of the Electronic Communications Privacy Act of 1986 (Pub.L. No. 99-508 (Oct. 21, 1986) 100 Stat. 1848) to fill a gap in the protections afforded by the Fourth Amendment. As one commentator observed: "The Fourth Amendment offers strong privacy protections for our homes in the physical world. Absent special circumstances, the government must first obtain a search warrant based on probable cause before searching a home for evidence of crime. When we use a computer network such as the Internet, however, a user does not have a physical 'home,' nor really any private space at all. Instead, a user typically has a network account consisting of a block of computer storage that is owned by a network service provider, such as America Online or Comcast. Although a user may think of that storage space as a 'virtual home,' in fact that 'home' is really just a block of ones and zeroes stored somewhere on somebody else's computer. This means that when we use the Internet, we communicate with and through that remote computer to contact other computers. Our most private information ends up being sent to private third parties and held far away on remote network servers." (Kerr, *A User's Guide to the Stored Communications Act—And a Legislator's Guide to Amending It* (2004) 72 Geo. Wash. L.Rev. 1208, 1209–1210, fns. omitted (Kerr).) The Fourth Amendment provides no protection for information voluntarily disclosed to a third party, such as an Internet service provider (ISP). (See *Smith v. Maryland* (1979) 442 U.S. 735, 743–744 [61 L.Ed.2d 220, 229, 99 S.Ct. 2577]; *United States v. Miller* (1976) 425 U.S. 435, 443 [48 L.Ed.2d 71, 79, 96 S.Ct. 1619].)

■ To remedy this situation, the SCA creates a set of Fourth Amendment-like protections that limit both the government's ability to compel ISP's to disclose customer information and the ISP's ability to voluntarily disclose it. (Kerr, *supra*, 72 Geo. Wash. L.Rev. at pp. 1212–1213.) "The [SCA] reflects Congress's judgment that users have a legitimate interest in the confidentiality of communications in electronic storage at a communications facility. Just as trespass protects those who rent space from a commercial storage facility to hold sensitive documents, [citation], the [SCA] protects users whose electronic communications are in electronic storage with an ISP or other electronic communications facility." (*Thoefel v. Farey-Jones* (9th Cir. 2003) 359 F.3d 1066, 1072–1073.)

■ The SCA addresses two classes of service providers, those providing electronic communication service (ECS) and those providing remote computing service (RCS). An ECS is "any service which provides to users thereof

the ability to send or receive wire or electronic communications." (18 U.S.C. § 2510(15); see 18 U.S.C. § 2711(1).) An RCS provides "computer storage or processing services by means of an electronic communications system." (18 U.S.C. § 2711(2).) Subject to certain conditions and exceptions, the SCA prohibits ECS's from knowingly divulging to any person or entity the contents of a communication while in "electronic storage" (18 U.S.C. § 2702(a)(1)) and prohibits RCS's from knowingly divulging the contents of any communication "which is carried or maintained on that service" (*id.*, § 2702(a)(2)). One exception is recognized where the customer or subscriber has given consent to the disclosure. (*Id.*, § 2702(b)(3).)

Any analysis of the SCA must be informed by the state of the technology that existed when the SCA was enacted. (Note, *Free at What Cost?: Cloud Computing Privacy Under the Stored Communications Act* (2010) 98 Geo. L.J. 1195, 1204 (Note).) "[C]omputer networking was in its infancy in 1986. Specifically, at the time Congress passed the SCA in the mid-1980s, 'personal users [had begun] subscribing to self-contained networks, such as Prodigy, CompuServe, and America Online,' and 'typically paid based on the amount of time they were connected to the network; unlike today's Internet users, few could afford to spend hours casually exploring the provider's network. After connecting to the network via a modem, users could download or send e-mail, post messages on a "bulletin board" service, or access information.' [Citation.] Notably, the SCA was enacted before the advent of the World Wide Web in 1990 and before the introduction of the web browser in 1994." (*Crispin v. Christian Audigier, Inc.* (C.D.Cal. 2010) 717 F.Supp.2d 965, 971, fn. 15 (*Crispin*), quoting Note, *supra*, 98 Geo. L.J. at p. 1198.) In light of rapid changes in computing technology since the enactment of the SCA, "[c]ourts have struggled to analyze problems involving modern technology within the confines of this statutory framework, often with unsatisfactory results." (*Konop v. Hawaiian Airlines, Inc.* (9th Cir. 2002) 302 F.3d 868, 874.)

 Under the SCA, an ECS is prohibited from divulging "the contents of a communication while in electronic storage by that service." (18 U.S.C. § 2702(a)(1).) However, the term "electronic storage" has a limited definition under the SCA. It covers "(A) any temporary, intermediate storage of a wire or electronic communication incidental to the electronic transmission thereof; and (B) any storage of such communication by an electronic communication service for purposes of backup protection of such communication." (18 U.S.C. § 2510(17).) Thus, only copies of electronic communications held by the ECS pending initial delivery to the addressee or held thereafter for backup purposes are protected. (*Thoefel v. Farey-Jones, supra,* 359 F.3d at pp. 1075–1076.)

 An RCS is prohibited from divulging the content of any electronic transmission that is carried or maintained on its service "solely for the

purpose of providing storage or computer processing services to [the] subscriber or customer, if the provider is not authorized to access the contents of any such communications for purposes of providing any services other than storage or computer processing." (18 U.S.C. § 2702(a)(2)(B).) Thus, if the service *is* authorized to access the customer's information for other purposes, such as to provide targeted advertising, SCA protection may be lost. (See Note, *supra*, 98 Geo. L.J. at pp. 1212–1214.)

In addition to protecting traditional electronic mail services and remote processing services, the courts have indicated the SCA was intended by Congress to protect electronic bulletin boards as well. " 'Computer bulletin boards generally offer both private electronic mail service and newsgroups. The latter is essentially email directed to the community at large, rather than a private recipient.' [Citation.] The term 'computer bulletin board' evokes the traditional cork-and-pin bulletin board on which people post messages, advertisements, or community news. [Citation.] Court precedent and legislative history establish that the SCA's definition of an ECS provider was intended to reach a private [bulletin board system]. [Citations.]" (*Crispin, supra*, 717 F.Supp.2d at pp. 980–981.) A private bulletin board system is essentially one with restricted access rather than one open to the public at large.

██ In its order compelling consent to the release of Juror Number One's Facebook postings, respondent court cited *Moreno v. Hanford Sentinel, Inc.* (2009) 172 Cal.App.4th 1125, 1130 [91 Cal.Rptr.3d 858], for the proposition that the information covered by the order "was posted so that others might read it and that it was not private in any sense that relates to this inquiry." However, the MySpace posting at issue in *Moreno* was open to the public at large, not a select group of Facebook "friends" like the postings at issue here. A party does not forfeit SCA protection by making his communications available to a closed group, i.e., a private bulletin board. (*Crispin, supra*, 717 F.Supp.2d at pp. 980–981, fn. omitted.) Thus, respondent court's rationale does not withstand scrutiny.

Juror Number One contends Facebook has been recognized as an ECS within the meaning of the SCA, citing *Crispin, supra*, 717 F.Supp.2d 965. In *Crispin*, the federal district court concluded Facebook and MySpace qualify as both ECS's and RCS's. The court provided the following description of those sites: " 'Facebook and MySpace, Inc., are companies which provide social networking websites that allow users to send and receive messages, through posting on user-created "profile pages" or through private messaging services.' . . . Facebook's user-created profile page is known as the Facebook 'wall,' 'a space on each user's profile page that allows friends to post messages for the user to see.' These messages . . . 'can be viewed by anyone

with access to the user's profile page, and are stored by Facebook so that they can be displayed on the Facebook website, not as an incident to their transmission to another place.' Similarly . . . MySpace has a profile page with a 'comments' feature that is identical to the Facebook wall." (*Id.* at pp. 976–977, fns. omitted.)

The court in *Crispin* concluded that, because Facebook and MySpace provide limited access to messages posted by users on the Facebook "wall" or the MySpace "comments" feature, there is no basis for distinguishing those features from a restricted access electronic bulletin board. There is also no basis for distinguishing the private messaging services provided by those companies from traditional Web-based e-mail. Hence, the court concluded Facebook and MySpace qualified as ECS's. (*Crispin, supra*, 717 F.Supp.2d at pp. 981–982.)

The court next considered whether messages posted on the Facebook wall are in "electronic storage" within the meaning of the SCA. As noted above, this requires either that the message is in temporary, intermediate storage awaiting delivery, or is in backup storage. Regarding the former, the court noted that messages posted to the Facebook wall are not in intermediate storage awaiting delivery to the recipient, because the wall itself is the recipient or final destination for the messages. (*Crispin, supra*, 717 F.Supp.2d at pp. 988–989.) Nevertheless, the court found the messages, once posted, are held for backup purposes. (*Id.* at p. 989.) In the alternative, the court concluded Facebook qualifies as an RCS with respect to posted messages held on the wall. (*Id.* at p. 990.)

Assuming *Crispin* was correctly decided, that case did not establish *as a matter of law* that Facebook is either an ECS or an RCS or that the postings to that service are protected by the SCA. The findings in *Crispin* were based on the stipulations and evidence presented by the parties in that case. The court noted that the parties "provided only minimal facts regarding the three third-party entities that were subpoenaed." (*Crispin, supra*, 717 F.Supp.2d at p. 976.) The parties cited the companies' home pages and Wikipedia as authority. (*Ibid.*)

Juror Number One has provided this court with nothing, either by way of the petition or the supporting documentation, as to the general nature or specific operations of Facebook. Without such facts, we are unable to determine whether or to what extent the SCA is applicable to the information at issue in this case. For example, we have no information as to the terms of any agreement between Facebook and Juror Number One that might provide for a waiver of privacy rights in exchange for free social networking services. Nor do we have any information about how widely Juror Number One's posts are available to the public.

But even assuming Juror Number One's Facebook postings are protected by the SCA, that protection applies only as to attempts by the court or real parties in interest to compel Facebook to disclose the requested information. Here, the compulsion is on Juror Number One, not Facebook.

In *Flagg v. City of Detroit* (E.D.Mich. 2008) 252 F.R.D. 346 (*Flagg*), the plaintiff issued subpoenas for text messages held by SkyTel, Inc., a text messaging service that had contracted with the city to provide such services until 2004 and had maintained the messages thereafter. The city moved to quash the subpoena, arguing the messages were protected by the SCA. (252 F.R.D. at pp. 347–348.) The federal district court held that, because the messages remained in the constructive control of the city, they were subject to discovery under the federal rules, notwithstanding the SCA. (252 F.R.D. at pp. 352–357.) However, the proper procedure would be to seek the information by a document request to the city rather than a third party subpoena. (*Id.* at p. 366.) To the extent consent of the city is required by the SCA, the city has an obligation under the discovery rules to provide that consent to the service provider. (252 F.R.D. at p. 359.)

■ In effect, the court in *Flagg* equated the situation presented to that where the materials sought to be discovered were in the actual possession of the party. The court explained: "[A] party has an obligation under [Federal Rules of Civil Procedure,] Rule 34 to produce materials within its control, and this obligation carries with it the attendant duty to take the steps necessary to exercise this control and retrieve the requested documents. . . . [A] party's disinclination to exercise this control is immaterial, just as it is immaterial whether a party might prefer not to produce documents in its possession or custody." (*Flagg, supra,* 252 F.R.D. at p. 363.) The court continued: "It is a necessary and routine incident of the rules of discovery that a court may order disclosures that a party would prefer not to make. . . . [T]his power of compulsion encompasses such measures as are necessary to secure a party's compliance with its discovery obligations. In this case, the particular device that the SCA calls for is 'consent,' and [the defendant] has not cited any authority for the proposition that a court lacks the power to ensure that this necessary authorization is forthcoming from a party with the means to provide it. Were it otherwise, a party could readily avoid its discovery obligations by warehousing its documents with a third party under strict instructions to release them only with the party's 'consent.' " (*Ibid.*; see *O'Grady v. Superior Court* (2006) 139 Cal.App.4th 1423, 1446 [44 Cal.Rptr.3d 72] ["Where a party to the communication is also a party to the litigation, it would seem within the power of a court to require his consent to disclosure on pain of discovery sanctions."].)

Thus, the question here is not whether respondent court can compel Facebook to disclose the contents of Juror Number One's wall postings but

whether the court can compel Juror Number One to do so. If the court can compel Juror Number One to produce the information, it can likewise compel Juror Number One to consent to the disclosure by Facebook. The SCA has no bearing on this issue.

 Juror Number One contends disclosure of the requested information violates the Fourth Amendment "in that [he] has a legitimate expectation of privacy in the records." However, beyond merely asserting this to be so, Juror Number One provides no argument or citation to authority. As noted earlier, Juror Number One has provided no specifics as to the operation of Facebook or the nature of his contractual relationship with the Web site. Obviously, the extent of Juror Number One's "legitimate expectation of privacy" under the Fourth Amendment would depend on the extent to which his wall postings are disseminated to others or are available to Facebook or others for targeted advertising. Where a point is raised in an appellate brief without argument or legal support, "it is deemed to be without foundation and requires no discussion by the reviewing court." (*Atchley v. City of Fresno* (1984) 151 Cal.App.3d 635, 647 [199 Cal.Rptr. 72].)

Likewise with Juror Number One's Fifth Amendment claim. Juror Number One asserts he may not be compelled to give evidence against himself. Juror Number One again provides no further argument or citation to authority. But, more significantly, at this point in the litigation and on this record, his Fifth Amendment claim is, at best, speculative. Should Juror Number One's rights under the Fifth Amendment in fact come into play as this litigation proceeds, the court will be able to consider and resolve them at that time.

Juror Number One argues he nevertheless has a privacy right not to disclose his Facebook posts. He cites as support Code of Civil Procedure sections 206 and 237, which protect jurors against involuntary disclosure of personal identifying information. Juror Number One argues these provisions demonstrate a strong public policy to protect jurors from being compelled to discuss their deliberations. However, as noted above, Juror Number One has failed to demonstrate any expectation of privacy in his Facebook posts. At any rate, protection against disclosure of personal identifying information that might be used by a convicted defendant to contact or harass a juror is not the same thing as protection of a juror's communications, which themselves are misconduct.

But even if Juror Number One has a privacy interest in his Facebook posts, that interest is not absolute. It must be balanced against the rights of real parties in interest to a fair trial, which rights may be implicated by juror misconduct. Thus, the question becomes whether respondent court had the authority to order Juror Number One to disclose the messages he posted to

Facebook during the criminal trial as part of its inherent power to control the proceedings before it and to assure real parties in interest a fair trial.

■ "A trial court has inherent as well as statutory discretion to control the proceedings to ensure the efficacious administration of justice." (*People v. Cox* (1991) 53 Cal.3d 618, 700 [280 Cal.Rptr. 692, 809 P.2d 351], disapproved on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22 [87 Cal.Rptr.3d 209, 198 P.3d 11].) "Criminal defendants have a right to trial by an impartial jury. (U.S. Const., 6th Amend.) '[T]here exists a "strong public interest in the ascertainment of the truth in judicial proceedings, including jury deliberations." [Citation.] . . . Lifting the veil of postverdict secrecy to expose juror misconduct serves an important public purpose. " '[T]o hear such proof would have a tendency to diminish such practices and to purify the jury room, by rendering such improprieties capable and probable of exposure, and consequently deterring jurors from resorting to them.' " [Citation.]' [Citation.]" (*People v. Tuggles* (2009) 179 Cal.App.4th 339, 379–380 [100 Cal.Rptr.3d 820].) "When a trial court is aware of *possible* juror misconduct, the court 'must "make whatever inquiry is reasonably necessary" ' to resolve the matter." (*People v. Hayes* (1999) 21 Cal.4th 1211, 1255 [91 Cal.Rptr.2d 211, 989 P.2d 645].)

Juror Number One contends the trial court had no authority to compel production of the Facebook posts, because it had completed its investigation of juror misconduct. He repeatedly asserts the trial court conducted a hearing, examined the jurors, and found the jurors testified truthfully. Implicitly, Juror Number One questions the need for any further investigation of the matter, inasmuch as he testified he posted nothing of substance on Facebook. According to Juror Number One, once he informed the court under oath that he did not post anything of substance to Facebook, the court has no power to inquire further. Juror Number One argues the order at issue here is not really part of the court's continued inquiry into misconduct but an effort to enforce the failed attempts by real parties in interest to subpoena the Facebook records.

Juror Number One's assertion that the trial court accepted Juror Number One's claim that he posted nothing substantive to Facebook is apparently based on the following comment by the court during discussions about whether to bring in additional jurors to testify: "It seems to me that all four jurors who spoke were credible. It seems to me that all four jurors were doing their best to be open and honest, and to convey what they recall with regard to the deliberations. I did not get an impression from any one of the four jurors that there was an effort to hide anything."

But assuming the court believed Juror Number One had made no effort to hide anything, that does not also mean it believed he testified accurately.

Juror Number One may well not have remembered posting anything of substance on Facebook, yet the evidence may show otherwise. When asked how many times he recalled posting about the case during trial, Juror Number One initially responded: "I probably posted about 'Day 22' or 'Day 24.' That's about it. Not really posting every day something negative or anything at all." Later, Juror Number One acknowledged he "posted something every other day." He also testified that he would go onto Facebook to see what others had posted to his account, but claimed he did not look at items posted in response to his own postings about the trial.

In light of Juror Number One's equivocation about how often and what he posted to Facebook, and the court's express finding that there had been misconduct, with the degree of misconduct still at issue, it can hardly be said respondent court concluded its investigation of the matter. The court may have completed its examination of the jurors, but there was still some question about the content of the Facebook posts themselves. In this regard, it must be remembered that those posts are not just potential evidence of misconduct. They *are* the misconduct.

Juror Number One also contends respondent court's order "necessarily encompass[es] not only [his] privacy, but that of other individuals who were *not* jurors, merely because they are [his] Facebook 'friends' and may have posted to his Facebook site during the trial." But the order at issue here does not encompass posts by Juror Number One's "friends." The court ordered only that Juror Number One consent to the release of posts made by him during trial. In any event, to the extent others have posted to Juror Number One's Facebook wall, they have given up any privacy right in those posts as to Juror Number One. It would be as if the "friend" had sent Juror Number One a letter which was still in the juror's possession. If the juror's papers are subject to search, then the letter from the "friend" would also be subject to search.

Juror Number One argues several of his Facebook posts were presented to the trial court during the misconduct hearing and none revealed any prejudice to real parties in interest. However, this puts the cart before the horse. If a juror were to acknowledge having consulted with an attorney during trial but refused to say what was discussed, there would be no way to determine from this alone if the communications were potentially prejudicial. By Juror Number One's theory, the court could inquire no further.

The trial in this matter lasted approximately two months. Juror Number One admitted posting something every other day during trial. Thus, there were potentially 30 posts. Juror Number One acknowledged deleting some of his posts, although there is no explanation as to why.

The present matter no longer involves a claim of potential misconduct. Misconduct has been established without question. The only remaining issue is whether the misconduct was prejudicial. This cannot be determined without looking at the Facebook posts. Yet Juror Number One would bar the trial court from examining the posts to determine if there was prejudice because there has been no showing of prejudice.

In summary, in the present matter, Juror Number One does not claim respondent court exceeded its inherent authority to inquire into juror misconduct. Just as the court may examine jurors under oath (*People v. Hedgecock* (1990) 51 Cal.3d 395, 417–418 [272 Cal.Rptr. 803, 795 P.2d 1260]), it may also examine other evidence of misconduct. In this instance, the court seeks to review in camera the very items—the Facebook posts—that constitute the misconduct. Juror Number One contends such disclosure violates the SCA, but it does not. Even assuming the Facebook posts are protected by the SCA, the SCA protects against disclosure by third parties, not the posting party. Juror Number One also contends the order is not authorized, because the court has completed its investigation of misconduct. But such investigation obviously has not been completed. Juror Number One also contends the compelled disclosure violates his Fourth and Fifth Amendment rights. However, beyond asserting this to be so, he provides no argument or citation to authority. Thus, those arguments are forfeited. Finally, Juror Number One argues forced disclosure of his Facebook posts violates his privacy rights. However, Juror Number One has not shown he has any expectation of privacy in the posts and, in any event, those privacy rights do not trump real parties in interest's right to a fair trial free from juror misconduct. The trial court has the power and the duty to inquire into whether the confirmed misconduct was prejudicial.

In the absence of further argument or authority, we conclude Juror Number One has failed to establish respondent court's order exceeded its power to inquire into alleged juror misconduct. The petition for writ of prohibition must be denied.

### DISPOSITION

The petition for writ of prohibition is denied. Upon this decision becoming final, the stay previously ordered in this matter is vacated.

Raye, P. J., concurred.

**MAURO, J.,** Concurring.—The majority opinion states that "even assuming Juror Number One's Facebook postings are protected by the [Stored Communications Act (SCA) (18 U.S.C. § 2701 et seq.)], that protection applies only

as to attempts by the court or real parties in interest to compel Facebook to disclose the requested information. Here, the compulsion is on Juror Number One, not Facebook." (Maj. opn., *ante*, at p. 864.)

It is true the compulsion is on Juror Number One to "consent" to the production of documents. But the trial court is seeking the documents from Facebook, not from Juror Number One. The trial court crafted its order to take advantage of the consent exception in the SCA (Stored Communications Act). (18 U.S.C. § 2702(b)(3).) It ordered Juror Number One to "execute a consent form sufficient to satisfy the exception stated in Title 18, U.S.C. section 2702(b) allowing Facebook to supply the postings made by [Juror Number One] during trial." In essence, the trial court's order is an effort to compel indirectly (through Juror Number One) what the trial court might not be able to compel directly from Facebook. This is arguably inconsistent with the spirit and intent of the protections in the SCA. Compelled consent is not consent at all. (See, e.g., *Schneckloth v. Bustamonte* (1973) 412 U.S. 218, 228, 233 [36 L.Ed.2d 854, 863, 866, 93 S.Ct. 2041] [coerced consent is merely a pretext for unjustified intrusion].)

The majority opinion explains that "[i]f the court can compel Juror Number One to produce the information, it can likewise compel Juror Number One to consent to the disclosure by Facebook." (Maj. opn., *ante*, at p. 865.) This may ultimately be true, but here the trial court bypassed a determination as to whether it could compel Juror Number One to produce the documents. Defendant Demetrius Royster had issued subpoenas to both Facebook and Juror Number One directing them to produce Juror Number One's postings. Facebook and Juror Number One both moved to quash the subpoenas. The trial court continued the hearing on Facebook's motion to quash and granted Juror Number One's motion to quash, ruling that the subpoena against Juror Number One was overbroad. The trial court then concluded it was "unnecessary" to determine whether it could directly compel Facebook or Juror Number One to produce the documents in their possession.[1] Thus, the trial court compelled consent even though other statutory procedures to directly compel production of the documents were still available and had not yet been exhausted.

Nonetheless, Juror Number One does not assert these specific concerns as contentions in his petition for writ of prohibition, perhaps recognizing that raising such procedural matters would merely delay resolution of the ultimate issues in the case. Instead, he argues the trial court's order violated his rights under constitutional and federal law. He also asserts that the order was an unreasonable intrusion because there is no evidence the Facebook posts were

---

[1] Counsel for Juror Number One admitted during oral argument in this court that Facebook sent him the posts sought by the trial court.

prejudicial. This final contention encompasses the appropriate balance between Juror Number One's privacy concerns and defendants' right to a fair trial, and it warrants further discussion.

Juror Number One's Facebook posts violated the trial court's instructions to the jury. (Pen. Code, § 1122, subd. (a)(1); CALCRIM No. 101.) This was serious misconduct giving rise to a presumption of prejudice. (*In re Hitchings* (1993) 6 Cal.4th 97, 118 [24 Cal.Rptr.2d 74, 860 P.2d 466]; accord, *People v. Wilson* (2008) 44 Cal.4th 758, 838 [80 Cal.Rptr.3d 211, 187 P.3d 1041] (*Wilson*).)

"The disapproval of juror conversations with nonjurors derives largely from the risk the juror will gain information about the case that was not presented at trial." (*People v. Polk* (2010) 190 Cal.App.4th 1183, 1201 [118 Cal.Rptr.3d 876].) Nonetheless, the presumption of prejudice that arises from discussing the case with nonjurors "is rebutted . . . if the entire record in the particular case, including the nature of the misconduct or other event, and the surrounding circumstances, indicates there is no reasonable probability of prejudice, i.e., no *substantial likelihood* that one or more jurors were actually biased against the defendant." (*In re Hamilton* (1999) 20 Cal.4th 273, 296 [84 Cal.Rptr.2d 403, 975 P.2d 600], original italics (*Hamilton*); accord, *In re Lucas* (2004) 33 Cal.4th 682, 697 [16 Cal.Rptr.3d 331, 94 P.3d 477].)

As the California Supreme Court explained in *Hamilton*, "The standard is a pragmatic one, mindful of the 'day-to-day realities of courtroom life' [citation] and of society's strong competing interest in the stability of criminal verdicts [citations]. It is 'virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote.' [Citation.] Moreover, the jury is a 'fundamentally human' institution; the unavoidable fact that jurors bring diverse backgrounds, philosophies, and personalities into the jury room is both the strength and the weakness of the institution. [Citation.] '[T]he criminal justice system must not be rendered impotent in quest of an ever-elusive perfection. . . . [Jurors] are imbued with human frailties as well as virtues. If the system is to function at all, we must tolerate a certain amount of imperfection short of actual bias.' [Citation.]" (*Hamilton, supra*, 20 Cal.4th at p. 296.)

Accordingly, juror conversations involving peripheral matters, rather than the issues to be resolved at trial, are generally regarded as nonprejudicial. (*Wilson, supra*, 44 Cal.4th at pp. 839–840 ["trivial" comments to a fellow juror were not prejudicial where not meant to persuade]; *People v. Page* (2008) 44 Cal.4th 1, 58–59 [79 Cal.Rptr.3d 4, 186 P.3d 395] [circulation of a cartoon in the jury room that did not bear on guilt was not misconduct]; *People v. Avila* (2006) 38 Cal.4th 491, 605 [43 Cal.Rptr.3d 1, 133 P.3d 1076]

[juror statements disparaging counsel and the court were not material because they had no bearing on guilt]; *People v. Stewart* (2004) 33 Cal.4th 425, 509–510 [15 Cal.Rptr.3d 656, 93 P.3d 271] [a juror who complimented the appearance of the defendant's former girlfriend committed nonprejudicial misconduct of a " 'trifling nature' "]; *People v. Majors* (1998) 18 Cal.4th 385, 423–425 [75 Cal.Rptr.2d 684, 956 P.2d 1137] [general comments by jurors that did not address the evidence were not prejudicial]; *People v. Loot* (1998) 63 Cal.App.4th 694, 698–699 [74 Cal.Rptr.2d 324] [a juror who asked a public defender whether the prosecutor was " 'available' " committed "technical," but nonprejudicial, misconduct].)

In determining whether communications are prejudicial or if the presumption of prejudice has been rebutted, the court must consider the " ' "nature and seriousness of the misconduct, and the probability that actual prejudice may have ensued." ' [Citation.]" (*Wilson, supra,* 44 Cal.4th at p. 839, italics omitted; see *People v. Polk, supra,* 190 Cal.App.4th at pp. 1201–1202.)

Four jurors testified under oath at the posttrial hearing. Juror No. 5 testified that she had access to Juror Number One's Facebook postings when she became a Facebook friend of his after the jury was discharged. She said she did not receive any Facebook communications regarding the trial during trial or deliberations. After the jury was discharged, Juror No. 5 found at least one Facebook posting by Juror Number One that he made during the trial, but she did not remember any others. She did not notice any comments in response to Juror Number One's post. When presented in the posttrial hearing with a copy of five pages from Juror Number One's Facebook wall—exhibit D, pages 19 through 23 in the record—Juror No. 5 said they appeared to be the Facebook pages that she had previously seen. Juror No. 5 recognized on those five pages the Facebook posting on May 18, at 7:36 a.m. from Juror Number One that she had seen. Juror No. 5 testified that there was nothing missing on the copy of the five Facebook pages from what she remembered seeing. She is still a Facebook friend with Juror Number One, and other jurors had been "friended" by Juror Number One, too. Juror No. 5 did not talk to the other juror Facebook friends about what Juror Number One had posted.

Exhibit D, the copy of Facebook postings, includes the following relevant entries (with original ellipsis points):

"May 17 at 3:09pm via Facebook for iPhone": "Week 5 of jury duty . . . [.]" Below that post was the following comment from a Facebook friend later that afternoon: "[W]ow . . . never been on jury duty that long . . . ." And below that, another friend posted a comment later that evening, saying "5 weeks, difil [*sic*] de creer, pues que hicieron para estar en un caso tan largo" which

could be understood to mean "5 weeks, hard to believe, but what did they do in order to be in a case so long."

"May 18 at 7:36am": "Back to jury duty can it get any more BORING than going over piles and piles of metro pcs phone records . . . .uuuggghhhhhh." Below the post, a Facebook friend indicated that he or she "like[d]" that comment.

"May 24 at 12:28am": "Jury duty week six . . . [.]" The copy indicates there were four comments from friends, but only two are visible on the copy. One comment that evening says, "did they convict [S]acramento for pretending to have a pro basketball team?" The other comment that evening says, "You still doing that shit? Sorry to hear holmes!"

"June 27 at 11:21pm via Facebook for iPhone": "Great to have my life back to normal . . . . NO MORE JURY DUTY . . . ." The copy indicates that the post was made after the jury had been discharged, and that there were five comments to the post.

Juror Number One testified next. He admitted posting Facebook entries sporadically about the trial even though the trial judge had instructed the jurors not to talk about the case with anyone. He authenticated exhibit D as depicting him on Facebook. He testified that he did not recall posting anything other than that he was on jury duty, counting down the days, and in one posting he said the piles and piles of Metro PCS phone record evidence was boring and that he almost fell asleep. He said if they had access to his Facebook that day, he did not think they would still find the postings he made during the trial, because he tries to delete a lot of things. But he said he had no idea prior to the hearing why he had been called in for the hearing.

Juror Number One testified that he never had verbal discussions with people about the case. He said he never talked to other jurors about the Facebook postings, and they did not know about them during the trial.

Juror No. 8 testified that Juror Number One never mentioned Facebook to her, she does not use Facebook, and she does not know anything about it. Juror No. 5 told her, as they were waiting in the hall prior to the posttrial hearing, that Juror Number One had posted on Facebook, but Juror No. 8 did not have any personal knowledge about that.

Juror No. 3 testified that he was not aware that any juror might have been doing anything with Facebook, and he had no Facebook communications with other jurors.

The evidence presented at the posttrial hearing indicated that the Facebook posts involved peripheral matters and did not involve issues to be resolved at trial. Although Juror Number One admitted deleting Facebook posts, he testified that the only things he ever posted regarding the trial were comments about the number of weeks he was on jury duty, counting down the days, and in one post mentioning that the phone record evidence was boring. Juror No. 5 and Juror Number One both testified that exhibit D accurately reflected the type of Facebook posts made by Juror Number One about the trial. There was no evidence that Juror Number One deleted Facebook posts in anticipation of the posttrial hearing. Juror No. 5 said in her declaration that the alleged inappropriate conduct did not influence her decision in the case, and the other jurors did not have access to the posts during the trial and did not talk about them during the trial. After the hearing, the trial court said the testifying jurors were credible and seemed to be doing their very best to be open and honest. The trial court added, "I did not get an impression from any one of the four jurors that there was an effort to hide anything."

The question is whether this evidentiary record rebuts the presumption of prejudice. Juror Number One says it does. The majority opinion says this record cannot rebut the presumption until all of the Facebook posts are reviewed by the trial court, noting that "Juror Number One would bar the trial court from examining the posts to determine if there was prejudice because there has been no showing of prejudice." (Maj. opn., *ante*, at p. 868.)

The majority opinion is correct that there has been no showing of prejudice on this record. Moreover, the evidence elicited at the posttrial hearing could be construed to negate the possibility of prejudice, even in the deleted posts. Thus, it is possible to conclude, as Juror Number One urges, that the record does not establish a substantial likelihood that one or more jurors were actually biased against defendants. (*Hamilton, supra*, 20 Cal.4th at p. 296.)

That might have been the end of the analysis if the trial court had made such findings and declined to continue the investigation. But here, the trial court—which was in the best position to evaluate the evidence—determined that it needed to see the deleted Facebook posts in order to rule out prejudice. At the same time, the trial court sought to balance Juror Number One's privacy concerns by ordering in camera review of the posts.

Although a trial court must avoid a " 'fishing expedition' " when considering allegations of alleged misconduct (*People v. Hedgecock* (1990) 51 Cal.3d 395, 419 [272 Cal.Rptr. 803, 795 P.2d 1260]), I am unaware of any authority preventing a trial court from taking steps to rule out prejudice once juror misconduct has been established. Because prejudice is presumed based on Juror Number One's misconduct in posting about the trial on Facebook, and

because we do not have all of Juror Number One's Facebook posts regarding the case, I cannot say there is "no substantial likelihood" Juror Number One was biased against defendants. (*Hamilton, supra*, 20 Cal.4th at p. 296, italics omitted.) Under these circumstances, the balance between Juror Number One's privacy concerns and defendants' right to a fair trial tips in favor of defendants.

Accordingly, I concur in the disposition.

A petition for a rehearing was denied June 21, 2012, and petitioner's petition for review by the Supreme Court was denied August 22, 2012, S203713.